**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Pamela Lainhart,                          )
                                          )
                    Plaintiff,            )      Case No. C-1-02-25
                                          )
          vs.                             )
                                          )
AK Steel Corporation,                     )
                                          )
                                          )
                    Defendant.            )


O R D E R

This matter is before the Court on Defendant AK Steel Corporation's motion for summary judgment (Doc. No. 22). For the reasons that follow, Defendant's motion is well-taken and is **GRANTED**.

I. Background

In March 1979, Plaintiff Pamela Lainhart began working for AK Steel Corporation as a general laborer. In 1982, Plaintiff became an apprentice in the electrical construction maintenance department. In 1989, Plaintiff became a journeyman electrician in the electrical construction department. Plaintiff's duties in this department involved new construction, installing switches, running conduit, and pulling wire. Throughout her employment with AK Steel, the terms and conditions of Plaintiff's employment were governed by the various collective bargaining agreements between AK Steel and the Armco Steel

Employees Independent Federation, Inc.[1]

It appears that, except for a few intermittent layoffs, Plaintiff's career with AK Steel proceeded smoothly until 1996. In February 1996, because of her seniority rights and because she had completed the required course work, Plaintiff was able to bid into a position as an electronic service repairman in the electrical maintenance and control department ("EMC"). Plaintiff's duties in EMC were a significant change from her duties in electrical construction.  Whereas in electrical construction Plaintiff was apparently involved in only the installation process, in EMC she became responsible, along with other repairmen, for troubleshooting and repairing the equipment and machinery involved in the manufacturing process.  The record reflects that this was a particularly dangerous job because of the high voltage needed to run the equipment, thus safety was obviously a paramount concern.

On March 20, 1996, Plaintiff was severely burned when the metal band of a paint brush she was using to clean a drive cabinet came in contact with a 480 volt line.  According to AK Steel, Plaintiff's supervisor and others had warned her not to work on the side of the cabinet where the accident occurred

---

[1]     AK Steel Corporation and Armco, Inc. merged in 1999. Although Plaintiff began her career with Armco, for ease of reference, the Court will simply refer to AK Steel as Plaintiff's employer.

because it was going to remain energized, or "hot."  AK Steel has

a disciplinary system in place in which employees can be written

up for various infractions.  Punishment ranges from informal

warnings, to formal warnings, to discipline time-off.  The most

serious punishment is a five-day suspension subject to

discharge.[2]  Lloyd Johnson, the manager of EMC, testified that

Plaintiff would have been disciplined for this accident, although

he did not say at what level, except that he believed that the

injuries she sustained were punishment enough.  Johnson Dep. at

34.

In any event, as a result of her injuries, Plaintiff

did not work for the next fourteen months.  In addition to her

physical injuries, Plaintiff also developed post-traumatic stress

disorder because of this accident.[3]  Plaintiff returned to work

---

[2]    Under the CBA, an employee cannot be discharged during
the five day suspension so he or she can appeal the employer's
decision.

[3]    Post-traumatic stress disorder, or PTSD,

       is a psychiatric disorder that can occur following the
       experience or witnessing of life-threatening events
       such as military combat, natural disasters, terrorist
       incidents, serious accidents, or violent personal
       assaults like rape.  People who suffer from PTSD often
       relive the experience through nightmares and
       flashbacks, have difficulty sleeping, and feel detached
       or estranged, and these symptoms can be severe enough
       and last long enough to significantly impair the
       person's daily life.

See, What is Post-Traumatic Stress Disorder?, available at,
http://www.ncptsd.org/facts/general/fs_what_is_ptsd.html (last

3

at AK Steel in June 1997.  Plaintiff was initially assigned to
clerical duties while she was being reintegrated into the
workforce.  After about three weeks, Plaintiff was returned to
her position as an electronic repairman and assigned to the North
Coating department.  Her work restrictions consisted of not
working in the department where she was injured and not being
exposed to extreme heat or caustic materials.

The CBA calls for a 28-day "break-in" period when an
employee transfers to a new department.  The break-in period is
both a training opportunity and sort of a grace period during
which the employee can go back to his or her former department
without loss of seniority in the former department.  During the
break-in period, the new transferee shadows a more experienced
repairman to both observe and to perform repairs under
supervision.  Sizemore Dep. at 23-24.  Otherwise, repairmen work
alone.  Because of the complexity of the responsibilities of EMC,
the break-in period is typically eight to twelve weeks.
Plaintiff, however, had a 59 week break-in period.  There seems
to be a general consensus among the various supervisors that
Plaintiff was a good worker but had difficulty troubleshooting
the equipment.

---

modified May 14, 2003)

Plaintiff had a clean record while she worked in electrical construction but was the subject of three disciplinary actions while in EMC.  On January 30, 1998, Plaintiff and another repairman, Bertram Jones, were disciplined for poor work performance for failing to notice that a roll was running backwards when they performed a speed check on the hearth roll. Jones received a one-day suspension, but Plaintiff's write-up was later rescinded because she was still considered to be in the break-in period.  See Doc. No. 24, Ex. H, at AKL 006242; Doc. No. 22, at Ex. A2.

On May 5, 1999, Plaintiff was disciplined for poor work performance while troubleshooting the Number 1 uncoiler machine. According to the report, Plaintiff used poor technique, resulting in a one hour shut down of the line, by failing to properly recognize that five of the six fuses in the machine were blown. Plaintiff was apparently confused about which fuses were bad because on some machines an indicator light comes on when a fuse is blown, whereas on other machines the light goes out when a fuse is blown.  Plaintiff's supervisors, however, said that Plaintiff could have easily detected which fuses were blown, without reference to the indicator lights, by using her meter. Plaintiff received a one-day suspension for this incident. Plaintiff contends that other male employees had similar difficulties diagnosing blown fuses but were not similarly

5

disciplined.

The third incident, and the one which precipitated this lawsuit, occurred on June 24, 1999. On this day, Plaintiff was called to repair the Number 2 uncoiler machine. Maintenance personnel on the scene determined that a brake on the machine was not getting enough voltage. In order to make the repair, Plaintiff "jumped" a resistor by running a wire around the resistor and put full voltage on the brake. This was viewed as a serious safety breach because the function of a resistor is to reduce the amount of volts flowing to the component. Because the brake was receiving full voltage, there was a serious threat that it could overheat and catch fire. Plaintiff, although she recognizes in hindsight that this was a mistake, minimizes the seriousness of the infraction because she remained on the scene to monitor the brake. Plaintiff received a five day suspension subject to discharge for "totally unacceptable work performance" and "totally incompetent troubleshooting." Plaint. Dep. Ex. 5. On appeal, however, the discipline was reduced from a suspension subject to discharge to a disciplinary suspension. In addition, Plaintiff was permanently disqualified from working in EMC and was transferred to employment reserve for further reassignment. Plaint. Dep. Ex. 2. Plaintiff was ordered to report to employment reserve by July 23, 1999.

Plaintiff, however, did not report to employment

reserve as directed.  On July 27, 1999, industrial relations representative Tom Brickey prepared and sent to Plaintiff a notice that AK Steel considered Plaintiff to have voluntarily resigned her employment for failure to report.  Plaint. Dep. Ex. 8.  However, in a letter to AK Steel that apparently crossed Brickey's letter in the mail, on July 23, 1999 Plaintiff's treating psychologist, Dr. Jennifer Stoeckel, stated that Plaintiff would need to be excused from work until August 6, 1999 because of "emotional related symptoms."  <u>Id.</u> Ex. 7.  On August 26, 1999, Brickey mailed Plaintiff a letter which stated that AK Steel had placed Plaintiff on medical leave under the Family and Medical Leave Act ("FMLA") retroactive to July 23, 1999 and that it no longer considered Plaintiff to have voluntarily resigned. <u>Id.</u> Ex. 9.

On September 29, 1999, Brickey sent Plaintiff another letter which informed her that work was still available in the mobile maintenance department.  <u>Id.</u> Ex. 10.  The letter further advised Plaintiff that AK Steel was maintaining Plaintiff on FMLA leave and that her FMLA-entitled leave expired on October 15, 1999.  <u>Id.</u>  By early December 1999, AK Steel had apparently still not taken any steps to terminate Plaintiff's employment although her FMLA leave had expired.  On December 9, 1999, Brickey sent Plaintiff a letter directing her to report to the AK Steel Medical Center on December 14, 1999, apparently for a physical

examination, and then to report immediately to the mobile maintenance department. Id. Ex. 11. Again, however, Plaintiff did not report as directed. Therefore, on December 27, 1999, Brickey sent Plaintiff a final letter advising her that her failure to report to work constituted a break in continuous service under the CBA and that her employment with AK Steel had ended. Id. Ex. 13.

Plaintiff filed a complaint of discrimination with the EEOC and received a right to sue letter. Complaint ¶ 6. On April 26, 2002, Plaintiff filed a complaint against AK Steel asserting six causes of action. Counts I and II of the complaint allege that AK Steel discriminated against Plaintiff on the basis of disability, in violation of the Americans With Disabilities Act ("the ADA"), 42 U.S.C. § 12101, et seq., and the Ohio Civil Rights Act, Ohio Rev. Code § 4112.02, et seq. Counts III and IV of the complaint allege that AK Steel discriminated against Plaintiff on the basis of age, in violation of the Age Discrimination in Employment Act ("the ADEA"), 29 U.S.C. § 621, et seq. and the Ohio Civil Rights Act. Finally, Counts V and VI of the complaint allege that AK Steel discriminated against Plaintiff on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Ohio Civil Rights Act.

Following the close of discovery, AK Steel filed a

motion for summary judgment on each of Plaintiff's claims. Doc.
No. 22.  In response, Plaintiff stated that she does not contest
AK Steel's motion for summary judgment on her claims for age and
disability discrimination.  See Doc. No. 24, at 1 n.1.
Accordingly, AK Steel's motion for summary judgment as to Counts
I through IV of the complaint is well-taken and is **GRANTED.**
Counts I through IV of the complain are **DISMISSED WITH PREJUDICE.**

With respect to Plaintiff's claims for gender
discrimination, AK Steel argues that summary judgment is
appropriate because Plaintiff cannot establish a prima facie case
of gender discrimination.  AK Steel contends that Plaintiff was
not subjected to an adverse employment action nor can she show
that she was treated differently than similarly-situated male
employees.  In any event, AK Steel argues, Plaintiff cannot show
that its reasons for taking the alleged adverse employment action
are a pretext for discrimination.

II. <u>Summary Judgment Standard of Review</u>

Summary judgment is proper "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The evidence presented on a motion for summary judgment
is construed in the light most favorable to the non-moving party,

who is given the benefit of all favorable inferences that can be drawn therefrom. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962). "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(emphasis in original). The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 250. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. <u>Id.</u>

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464, 472 (1962). "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties'

differing versions of the truth at trial." <u>First National Bank v. Cities Service Co.</u>, 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir.), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. <u>Id.</u> at 323; <u>Anderson</u>, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322. Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time

11

for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence.  Id.; Anderson, 477 U.S. at 250.  Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim.  Id.  Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits."  Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

## C. Analysis

At the outset, the Court notes that federal and Ohio state law employment discrimination claims are subject to the same evidentiary standards, and thus may be analyzed together on summary judgment.  Courtney v. Landair Transport, Inc., 227 F.3d 559, 563 (6th Cir. 2000); Jones v. Kilbourne Medical Lab., 162 F. Supp.2d 813, 831 n.20 (S.D. Ohio 2000).

A plaintiff establishes a prima facie case of discrimination if she presents direct evidence that she was discriminated against on the basis of a forbidden characteristic.

12

Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1081 (6th Cir. 1994). Once the plaintiff has produced direct evidence of discrimination, the burden shifts to the defendant to prove it would have taken the same action against the plaintiff without the discriminatory motivation. Id. However, if the plaintiff fails to produce direct evidence of discrimination or if the court does not find credible the plaintiff's proffered evidence of direct discrimination, then the mode of analysis is the McDonnell Douglas burden shifting framework. Terbovitz v. Fiscal Court of Adair County, 825 F.2d 111, 115 n.3 (6th Cir. 1987).

Under the McDonnell Douglas framework, a plaintiff may establish a prima facie case of discrimination based on circumstantial evidence by showing that: 1) she is a member of a protected class; 2) she suffered adverse employment action; 3) that she was qualified for the job lost or not gained; and 4) that a person not in the protected class replaced her. Id. A plaintiff may also satisfy the last part of the McDonnell Douglas test by showing that the defendant treated similarly-situated non-protected persons more favorably than the plaintiff. Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995).

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. Manzer,

29 F.3d at 1082.  If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are but a pretext for discrimination.  Id.  However, the burden of persuasion remains with the plaintiff at all times.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

The plaintiff may prove pretext in three ways:  1) by showing that the defendant's reasons had no basis in fact; 2) by showing that the proffered reasons did not actually motivate the defendant; or, 3) by showing that the proffered reasons were not sufficient for the defendant to act as it did.  Kline v. Tennessee Valley Authority, 128 F.3d 337, 346 (6th Cir. 1997). When the plaintiff proves pretext by the first or third methods, the fact finder may infer discrimination and the plaintiff need not produce any additional evidence of discrimination.  Id.  In the second situation, the factual basis for the defendant's actions is not challenged; therefore, the plaintiff must adduce additional evidence of discrimination in order to prevail.  Id. at 346-47.

Plaintiff has produced no direct evidence that she was discriminated against because of her gender.  Therefore, the proper mode of analysis is the McDonnell Douglas burden-shifting format.

AK Steel first moves for summary judgment on the

14

grounds that Plaintiff was not subjected to an adverse employment action.  Although we think that the record shows that Plaintiff was subjected to an adverse employment action, we think it is important to clarify what acts were and were not adverse employment actions.

An "adverse employment action" means a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  <u>Burlington Ind. v. Ellerth</u>, 524 U.S. 742, 761 (1998).  The record reflects that there were potentially three adverse employment actions that AK Steel took against Plaintiff: 1) the transfer from EMC to the mobile maintenance department; 2) the five day disciplinary suspension; and 3) Plaintiff's termination for failure to report.  Of these acts, only the first two can be considered adverse employment actions.

With regard to the first action, it is true that lateral transfers, without more, are generally not considered to be adverse employment actions.  <u>Kocsis v. Multi-Care Mgmt, Inc.</u>, 97 F.3d 876, 885 (6th Cir. 1996).  In this case, however, it is undisputed that the transfer from EMC to mobile maintenance involved a cut in Plaintiff's hourly wages.  AK Steel argues that this was not an adverse action because Plaintiff could have earned more in the mobile maintenance department than she did in

15

EMC because of the incentive program that was available to her in mobile maintenance.  We think, however, the fact that Plaintiff's opportunity to earn the same or higher wages was dependent on meeting certain incentives was adverse to her because she would have been required to do something more or different to earn the same salary.  In other words, this appears to be a materially adverse change in Plaintiff's working conditions.  Accordingly, the Court concludes that Plaintiff's transfer to the mobile maintenance department was an adverse employment action.

Plaintiff's five day suspension was obviously an adverse employment action.  See McKethan-Jones v. Ohio Dept. of Health, 7 Fed. Appx. 475, 479 (6th Cir. 2001) (five day suspension without pay is an adverse employment action).  No further elaboration is needed here.

Plaintiff's termination, however, was not an adverse employment action.  Although Plaintiff was initially subject to discharge for jumping the resistor, the discipline was reduced to a suspension during the grievance process.  See Dobbs-Weinstein v. Vanderbilt Univ., 185 F.3d 542, 546 (6th Cir. 1999)(no ultimate employment action where plaintiff was successful in grieving denial of tenure).  It is undisputed that Plaintiff was terminated because she failed to report back to work at the conclusion of her FMLA leave.  Employers are permitted to terminate an employee who fails to return to work upon the

expiration of FMLA leave. Hicks v. Leroy's Jewelers, Inc., 98-6596, 2000 WL 1033029, at **4-**5 (6th Cir. July 17, 2000). Furthermore, under the CBA, Plaintiff's failure to return to work at the conclusion of her leave is deemed to be a voluntary resignation. See Plaint. Dep. Ex. 15 at AKL 002262 (CBA, Art. VII, § L(2)(a)(1)). A voluntary resignation not amounting to a constructive discharge is not an adverse employment action and Plaintiff does not claim that she was constructively discharged. Hammon v. DHL Airways, Inc., 165 F.3d 441, 448 (6th Cir. 1999). Accordingly, the Court concludes that Plaintiff's termination was not an adverse employment action.

Having concluded that Plaintiff was subjected to two adverse employment actions, the Court turns to AK Steel's contention that she was not treated differently from similarly-situated males. In order to be similarly-situated, the plaintiff must show that all relevant aspects of her employment situation are nearly identical to the male employees' situation. Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). To be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for

17

it.  <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992)

Plaintiff identifies a number of male employees whom she contends were similarly-situated but whom AK Steel treated more favorably than her.  The first male employee is Louis McKnight.  According to Plaintiff, McKnight had accumulated thirty-three disciplinary actions over his term with AK Steel for absenteeism, poor work performance, and safety issues.  Initially, the Court notes that because Plaintiff was not disciplined for absenteeism, McKnight's problems with attendance do not present a comparable situation.  Second, the Court notes that many of McKnight's disciplinary infractions occurred before AK Steel and Armco merged; therefore, Plaintiff is presumably not comparable to McKnight with respect to those incidents because they occurred with a different employer.  <u>See</u> Doc. No. 24, Ex. G, at AKL 006106-005763.  Third, the Court notes that McKnight did not get off scot-free for his violations.  In January 1976, McKnight received a one-day suspension for absenteeism.  <u>Id.</u> at AKL 006104.  In April 1976, McKnight received a five-day suspension subject to discharge for absenteeism.  <u>Id.</u> at AKL 006103.  In February 1979, McKnight received a two day suspension for missing his shift.  <u>Id.</u> at AKL 006067.  In March 1979, McKnight received a five day suspension for missing his shift.  <u>Id.</u> at AKL 006062.  In December 1979, McKnight received a four day suspension for absenteeism.  <u>Id.</u> at AKL 005768.  In December

18

1985, McKnight received a three day suspension for absenteeism. Id. at AKL 006030. In December 1986, McKnight received a five day suspension for absenteeism. Id. at AKL 006028. In February 1987, McKnight was transferred out of the coke plant because of poor work performance and for creating a serious safety hazard. McKnight also received a five day suspension for this incident. Id. at AKL 005954, AKL 005953. Thus, in this particular incident, McKnight was treated the same as Plaintiff - he was transferred to a new department and received a five day suspension for creating a serious safety hazard. In February 1985, McKnight received a two day suspension for bringing a television to work. Id. at AKL 005910. In June 1993, McKnight received a one day suspension for sleeping at work. Id. at AKL 005764. In July 1993, McKnight received a three day suspension for failing to report to his shift. Id. at AKL 005763. In March 1999, McKnight received a one day suspension for being absent. Id. at AKL 005740. In July 1999, McKnight received a one day suspension for improperly completing his work log. Id. at AKL 005742. In August 2000, McKnight received a one day suspension for not wearing his safety glasses. Id. at AKL 005745. Finally, in November 2000, McKnight received a three day suspension for sleeping on the job. Id. at AKL 005757.

    McKnight was unquestionably a worse employee than Plaintiff. However, most of the problems detailed above involved

19

absenteeism, not safety issues, and McKnight was suspended repeatedly for those violations. As a result of the one serious safety issue that McKnight had, he received the same punishment as Plaintiff - a five day suspension. As AK Steel points out, the other safety issue, involving safety glasses, did not create a hazard to other employees and therefore is not comparable. Moreover, as AK Steel further notes, it actually terminated McKnight twice, only to have arbitrators reinstate his employment. Sizemore Dep. at 34. Thus, but for the arbitrators' intervention, AK Steel would have treated McKnight at least as harshly, if not more harshly, as it did Plaintiff. Therefore, Plaintiff has not shown that AK Steel treated McKnight more favorably than her.

The next alleged similarly-situated male identified by Plaintiff is Bertram Jones. Jones also had a number of disciplinary infractions. Again, however, there are significant differences between Jones' infractions and Plaintiff's infractions. Although Jones was disciplined twice for safety violations, the infractions were for failure to wear personal safety equipment as opposed to creating a general safety hazard, as was the case with Plaintiff's suspension, and thus were less serious. See Doc. No. 24, Ex. H, at AKL 006235, AKL 006291. The Court does observe that Plaintiff included in the Jones' exhibit an unsigned, undated memorandum which describes a safety lapse

20

which left Jones "lucky to be alive." See id. at AKL 006244.

Plaintiff, however, does not reference this incident in her brief
and there is no further evidence as to whether Jones was or was
not disciplined for this incident or whether others were placed
in jeopardy by his mistake.  Since Plaintiff bears the burden of
proof at the prima facie case stage, without further explanation,
the Court concludes that Plaintiff has not carried her burden of
showing that she and Jones were similarly-situated with respect
to this incident.  Furthermore, there is no evidence that Jones
was ever seriously injured as a result of any of his work lapses,
whereas the fact that Plaintiff was previously injured by hers
clearly was factor in the decision to suspend her and disqualify
her from EMC.  See Johnson Dep. at 33-37.  Therefore, the Court
concludes that Plaintiff has not demonstrated that she was
similarly-situated to Bertram Jones.

        Plaintiff then identifies a number of other male
employees - Jason Borger, Steve Cox, Mike Crawford, Harry Finch,
and Stephen Kakaris - who retained their jobs despite engaging in
similar conduct.  A closer look at their disciplinary records,
however, reveals than none on these men committed an equally
serious safety violation.  Borger's violations related to poor
attitude and initiative as well as fudging overtime requests.
Doc. No. 24, Ex. I, at AKL 005500-5503.  Cox received formal
warnings for poor soldering, taking to long to make a repair, and

not taking ownership of a problem.  Id. at AKL 005652, AKL 005656, AKL 005675.  Crawford was cited for having a poor attitude and received a formal warning, which was reduced to an informal warning during arbitration, and for poor work performance in repairing the edge guide system.  Id. at AKL 005676, AKL 005679.  Finch received two formal warnings for taking too long to make repairs.  Id. at AKL 005684, AKL 005694. Kakaris received a formal warning for taking too long to make a repair.  Id. at AKL 006445.  Kakaris then received a three day suspension for a combination of violations - a safety violation, poor work performance, and misuse of company property.  Id. at AKL 006447.  Kakaris' safety violation, however, was that he left his lock unattended on the shop desk and, therefore, out of his control.  Id.  In short, none of these incidents are the same or similar to Plaintiff's conduct in by-passing a resistor with a jump wire.

Plaintiff also claims that Martin Henderson created a safety hazard which shorted out a motor and, in another incident, caused a bank of computers to go offline without being disciplined.  Plaintiff omits to mention, however, that AK Steel determined that Henderson was not at fault for either incident. A supplier providing the wrong spare part was the reason for the first incident, Sizemore Dep. at 37, and the second incident was caused by a programming fault in the equipment provided by the

22

manufacturer.

Finally, Plaintiff names a few other male employees who also had performance and troubleshooting difficulties but who were not disqualified from EMC. See Doc. No. 24, at 14. As AK Steel correctly points out, however, Plaintiff makes no showing that these employees' technical deficiencies ever created serious safety hazards. And finally, while there is evidence in the depositions that it is appropriate to jump a resistor for diagnostic or troubleshooting purposes, no one testified that jumping a resistor as the actual repair to a machine is an acceptable practice, a fact with which even Plaintiff seems to agree. See Plaint. Dep. Vol. II at 281-82; Chapman Dep. at 26; Johnson Dep. at 54; King Dep. at 21-22; Keleman Dep. at 17-18, 23-24; Bailey Dep. 43-49, 108; Lehman Dep. at 26, 37, 41-42. Furthermore, to the extent that other unidentified male employees jumped resistors without being disciplined, there is no evidence they did so in order to make the actual repair to the machine.

In summary, Plaintiff has failed to demonstrate that there were similarly-situated male employees whom AK Steel treated more favorably than Plaintiff with respect to the same or similar workplace violation. Therefore, Plaintiff has failed to establish a prima facie case of gender discrimination with respect to both her disqualification and transfer from EMC and her five-day suspension.

23

The Court further finds that there is no evidence that AK Steel's reasons for transferring and suspending Plaintiff are pretextual. As evidence of pretext, Plaintiff again relies on the contention that similarly-situated males were treated more favorably than her. As just explained, however, Plaintiff has not shown that other males were similarly-situated to her with respect to workplace violations.

Accordingly, AK Steel's motion for summary judgment on Plaintiff's claims for gender discrimination under Counts V and VI of the complaint is well-taken and is **GRANTED.** Counts V and VI of the complaint are **DISMISSED WITH PREJUDICE.**

<u>Conclusion</u>

For the reasons stated, AK Steel's motion for summary judgment is well-taken in all respects, and it is, therefore, **GRANTED.** Plaintiff's claims are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED**

Date  December 3, 2003              s/Sandra S. Beckwith
                                   Sandra S. Beckwith
                                   United States District Judge

24